Citation Nr: 1331597 
Decision Date: 09/30/13 Archive Date: 10/02/13

DOCKET NO. 05-06 110 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to service connection for a skin disorder, including chloracne.

2. Entitlement to an initial rating higher than 30 percent for posttraumatic stress disorder prior to September 17, 2012.

3. Entitlement to an initial rating higher than 50 percent for posttraumatic stress disorder from September 17, 2012, forward.


REPRESENTATION

Appellant represented by: Virginia A. Girard-Brady, Attorney at Law


WITNESS AT HEARING ON APPEAL

Appellant and A.C.

ATTORNEY FOR THE BOARD

J. Meawad, Counsel


INTRODUCTION

The Veteran served on active duty from February 1968 to December 1970. 

This matter is before the Board of Veterans' Appeals (Board) on appeal of a rating decisions dated January 2005 and July 2005 of the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas. 

In February 2008, the Veteran appeared at a hearing before the undersigned Veterans Law Judge. A transcript of the hearing is in the record. 

In a decision in April 2008, the Board denied the claim for a higher rating for posttraumatic stress disorder and remanded the claim for service connection for chloracne. The Veteran appealed the Board's decision regarding claim for a higher rating for posttraumatic stress disorder to the United States Court of Appeals for Veterans Claims (Court). In an Order, dated in July 2009, the Court granted a Joint Motion to Remand of the parties, the VA Secretary and the Veteran, and remanded the case to the Board for readjudication consistent with the Joint Motion. 

In July 2010, the Board remanded the claim for a higher rating for posttraumatic stress disorder for further development.

The claim of service connection for a skin disorder is REMANDED to the Department of Veterans Affairs Regional Office.







FINDINGS OF FACT

From the effective date of service connection, posttraumatic stress disorder has been manifested by occupational and social impairment with reduced reliability and productivity under the General Rating Formula for Mental Disorders, including the symptoms associated with the diagnosis of posttraumatic stress disorder under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (DSM-IV) of the American Psychiatric Association, which is referred to in 38 C.F.R. § 4.130 (rating mental disorders), but not covered in the rating criteria.


CONCLUSION OF LAW

From the effective date of service connection, the criteria for an initial rating of 50 percent have been met; the criteria for an initial rating higher than 50 percent have been met. . 38 U.S.C.A. §§ 1155, 5107(b) (West 2002); 38 C.F.R. § 4.130, Diagnostic Code 9411 (2013).

The Veterans Claims Assistance Act of 2000 (VCAA)

Upon receipt of a complete or substantially complete application, VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. VA must notify the claimant of the information and evidence not of record that is necessary to substantiate a claim, which information and evidence VA will obtain, and which information and evidence the claimant is expected to provide. 

The appeal arises from the Veteran's disagreement with the initial evaluation following the grant of service connection. Once service connection is granted the claim is substantiated, additional notice is not required, and any defect in the notice is not prejudicial and will not be discussed. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 



The Veteran's service treatment records, VA medical treatment records, and private treatment records have been obtained. 38 U.S.C.A. § 5103A, 38 C.F.R. § 3.159. The Veteran has not indicated, and the record does not contain evidence, that he is in receipt of disability benefits from the Social Security Administration. 38 C.F.R. § 3.159 (c) (2). VA examinations were conducted in September 2002, December 2004, August 2010, and September 2012. The examinations are adequate because the Veteran's psychiatric symptoms were described in sufficient detail, so that the Board's evaluation of the disability is a fully informed one. Stefl v. Nicholson, 21 Vet. App. 120, 123 (2007).


REASONS AND BASES FOR FINDING AND CONCLUSION

Principles of Evaluating Disabilities

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4. The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual conditions in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. 

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. 

The Board will consider whether separate ratings may be assigned for separate periods of time based on facts found, a practice known as "staged ratings," whether it is an initial rating case or not. Fenderson v. West, 12 Vet. App. 119, 126-27 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007). 

Rating Criteria

Posttraumatic stress disorder has been rated 30 percent before September 17, 2012, and 50 percent from September 17, 2012, under 38 C.F.R. § 4.130, the General Rating Formula for Mental Disorders, Diagnostic Code 9411. 

Under the General Rating Formula for Mental Disorders, Diagnostic Code 9411, the criteria for a 30 percent rating are occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). 

The criteria for the next higher rating, 50 percent rating, are occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks (more than once a week); difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships.

The criteria for the next higher rating, 70 percent rating, are occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work like setting); inability to establish and maintain effective relationships. 


The evidence considered in determining the level of impairment for posttraumatic stress disorder under 38 C.F.R. § 4.130 is not restricted to the symptoms provided in Diagnostic Code 9411. Rather VA must consider all symptoms that affect the level of occupational and social impairment, including, if applicable, the symptoms of posttraumatic stress disorder identified in the DSM-IV (American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994).) 

The Global Assessment of Functioning (GAF) score is a scale reflecting the "psychological, social, and occupational functioning in a hypothetical continuum of mental health- illness." DSM-IV at 32. 

GAF scores ranging from 61 to 70, for example, reflect some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. Scores ranging from 51 to 60 reflect moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Scores ranging from 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

Neither the number of symptoms, nor the type of symptoms, nor the GAF score controls in determining whether the criteria for the next higher rating have been met. It is the effect of the symptoms, rather than the presence of symptoms, pertaining to the criteria for the next higher rating, that is determinative.








Facts and Analysis

A Rating Higher than 30 Percent

The Veteran was afforded a VA examination in September 2002. The Veteran reported having 3 sons with his ex-wife who he was married to from 1970 to 1992. He had worked at Bell Helicopter as a janitor and compost bonder, but had been out of work since March 2002. He was doing some carpenter work. He had trouble falling asleep and he checked the perimeter of his house when he woke s up. He was depressed, but he had no thoughts of suicide. He was fully oriented, but had trouble with abstract thinking. Affect was normal with no psychosis, delusions, hallucinations, or organicity. Memory and judgment were good, but he had little insight. His mood was mildly down. He was found to have no psychiatric disorder.

Private medical records from 2003 to 2004 show that the Veteran was treated for posttraumatic stress disorder. In March 2003, he described symptoms of nightmares, recurrent dreams, and flashbacks. He stated that he was becoming increasingly angry and that he had difficulty socializing with family and friends. He had difficulty relating to his wife and he had withdrawn from her. He had anger control problems which had resulted in verbal threats and violence. 

On mental status evaluation in April 2003, the Veteran had impaired memory, tense motor activity, and fair judgment. He complained of delusions, disorganized thinking, hallucinations, sleep disturbance, low energy, feelings of guilt, and suicidal and homicidal thoughts. The Veteran demonstrated some paranoia and suspiciousness, appeared distrustful, and he had difficulty being around other people, especially his neighbors. The Veteran stated that he had short term memory loss, poor concentration, lack of intimacy, and feelings of inadequacy. He also described occasionally hearing voices. Socially, the Veteran was less outgoing, lacked interest in outside pleasurable activities or hobbies, and he had few friends who were veterans. 



Emotionally, the Veteran was more aggressive and his anger was explosive and intense. He regularly had a depressed mood. He had a history of violence, including domestic violence. He described his household as chaotic and dysfunctional and his relationship with his second wife and sons was fair. He was employed with Bell Helicopters and was satisfied with his current employment without conflicts with supervisor or coworkers. 

In August 2003, the Veterans symptoms were nightmares, flashbacks, intrusive thoughts, memories of combat, anxiety, worry, and panic. In May 2004 the Veteran was having sleeplessness and was stressed about news related to the war in Iraq. He struggled with flashbacks of Vietnam. He drank 3 to 4 beers at night to help him relax. He stated that his relationship with his wife was improving due to his helping more at home. 

On VA examination in December 2004, the Veteran stated that he was working at Bell Helicopter and his previous job had been with an airplane manufacturer. He was previously laid off due to economic downturn. He had a few arrests due to domestic violence and DWI with no actual jail sentences, but overnight detentions. He had hostile feelings towards his current wife and stated that he had to hold himself back from resorting to violence. He admitted drinking beer on weekends. The Veteran appeared anxious. The VA examiner reported that posttraumatic stress disorder that the Veteran's mental status was within acceptable normal limits. The GAF score was 55 to 60. 

In February 2008, the Veteran stated that he could not get along with others, that he had assaulted his wife, that he was confused at work, and that he drank to self-medicate. He had thoughts of suicide and he walked around the house making sure the house was secure.






On VA examination in August 2010, the Veteran stated that when his psychiatrist was transferred he did not seek a new mental health provider and he discontinued treatment because he did not find it helpful. The Veteran was employed as a bonder operating a machine at Bell Helicopter where he had been working for 10 years. He had been promoted since his last VA examination to a more desirable position. He did not work with others, kept to himself, and did not report any difficulty at work. He had been married for 17 years and his wife, who accompanied him to the examination, stated that he was more argumentative and a "grouch," but was a bit calmer. He was easily angered and wanted to be by himself. His wife also reported that the Veteran fought in his sleep so they slept in different rooms. They did not have children together, but his wife had two grown children and three grandchildren who lived with their mother and they saw them infrequently due to a conflict with their parents. The Veteran would watch cartoons with the grandchildren. They used to live close to the Veteran's extended family, but they did not get along so he preferred to keep his distance. He was on poor terms with his brother and visited his mother several times a week. He did not mention his sons during the interview. The Veteran socialized only with his wife and her extended family. His wife stated that the Veteran would get upset and think that people were staring at him. 

The Veteran spent his time working in the yard, watching television and movies, and going out to a casino to walk around and eat. The Veteran drank a 12-pack of beer on the weekends. He denied any violent behavior since the last evaluation, but stated that he wanted to fight. He had thoughts of suicide, but denied any attempts. He did not have any impaired thought process or communication and denied any delusions or hallucinations. He did not have impaired memory at work and did not have obsessive or ritualistic behaviors that interfered with his ability to function. He did have panic attacks once or twice a week, but they were minimal symptoms. He was depressed and anxious and stated he was uncomfortable around strangers and irritable. He had difficulty falling asleep and would wake up about twice at night at which time he would check the house. He had nightmares once every two days and his wife reported hearing him yelling or moaning in his sleep. 



The Veteran was found to have recurrent intrusive thoughts and distressing dreams, and he avoided thoughts or feelings associated with the in-service stressors. He had a diminished interested in activities, felt detached from others, restricted range of affect, difficulty falling asleep or staying asleep, irritability or outbursts of anger, and hypervigilance. His symptoms caused clinically significant distress or impairment of social, occupational, or other important areas of functioning. The Veteran was diagnosed as having chronic posttraumatic stress disorder and was assigned a GAF score of 60. The VA examiner noted that the Veteran's occupational functioning was rather good due to his promotion and the Veteran did not exhibit difficulty following complex commands or significant memory problems. He appeared to be selective with interpersonal relationships, but this was not necessarily solely attributed to his posttraumatic stress disorder, but was also likely due to some personality characteristics. As he and his wife enjoyed going to the casino as a couple, he was not averse to going out in public and there was a level of trust in their relationship. 

Reconciling the various reports into a consistent disability picture, two elements of the present disability emerge. First, the Veteran has symptomatology that is associated with the rating criteria and symptomatology not covered in the rating criteria, but is associated with the diagnosis of posttraumatic stress disorder under the DSM-IV, which is referred to in 38 C.F.R. Part 4, § 4 .130 (rating mental disorders). And two, while there has been some fluctuation in the symptoms of PTSD, a material change in the overall severity of the disorder has not been demonstrated. In sum, since the Veteran has filed his claim for service connection, the disability picture has remained constant and the effect of posttraumatic stress disorder more nearly approximates the criteria for a 50 percent rating. 

As for occupational impairment, there is no evidence that symptoms of posttraumatic stress disorder were a factor in the Veteran's occupational functioning. 




Although he complained of having problems with short-term memory and poor concentration, the evidence does not demonstrate that his posttraumatic stress disorder affected his work and he reported to being satisfied with his job without conflicts with supervisor or coworkers and was in fact promoted. He was unemployed at various times, but this was due to economic problems and not due to his job performance.

As for social impairment, the Veteran was divorced from his first wife and struggled with anger and violence toward his second wife, but he reported having a fair relationship with his sons and wife and socialized with his wife's extended family and a few friends. In August 2010, the VA examiner noted that the Veteran enjoyed going to the casino with his wife, that the Veteran was not averse to going out in public and there was a level of trust in their relationship.

The Veteran was in individual therapy until 2004. In December 2004, the VA examiner described posttraumatic stress disorder as mild and assigned a GAF score between 55 and 60 indicating moderate symptoms or moderate difficulty in occupational and social functioning.

Overall, the symptoms of posttraumatic stress disorder resulted in a disability picture that more nearly approximates occupational and social impairment with reduced reliability and productivity. 

Although the Veteran has symptoms of delusions, hallucinations, suicidal ideation and impaired impulse control, which is listed in the criteria for rating higher than 50 percent, and the Veteran's has symptoms attributable to posttraumatic stress under DSM- IV, such as nightmares, irritability, intrusive thoughts, hypervigilance, and paranoia, the symptoms do not more nearly approximate or equate to occupational and social impairment that warrants a 70 percent rating as evidenced by the Veteran's ability to work a full-time job and have a fair relationship with his wife and friends. 



While the evidence supports a rating of 50 percent since service connection was granted, the preponderance of the evidence is against a rating higher than 50 percent prior to September 17, 2012. 

A Rating from September 17, 2012

The Veteran was afforded a VA examination in September 2012. The Veteran was diagnosed as having posttraumatic stress disorder and was assigned a GAF score of 55. The examiner indicated that the Veteran had occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily. The Veteran was with his wife of 20 years and stated they went out to eat, worked in the yard together, and went to the casino once a month. He also had army buddies who he was in touch with, worked on cars recreationally, saw his brother on weekends, and saw his granddaughter weekly who cheered him up. He was working for Bell Helicopters for the past 12 years, mostly by himself and did not supervise anyone. He had no conflicts or problems at work. He was not being treated and was not taking any medication. He reported talking about his problems with his brother and another veteran. 

The Veteran's wife stated that the Veteran was usually irritable and grouchy and they slept separately. The Veteran drank 2 to 3 beers nightly to get a good night of sleep, which was less than what he had drank previously. The VA examiner reported that the Veteran had recurrent and distressing recollections, recurrent distressing dreams, felt detached and estranged from others, had difficulty falling and staying asleep, was irritable or had outbursts of anger, and was hypervigilant. The symptoms caused clinically significant distress or impairment in social, occupational, or other important areas of functioning. He also had symptoms of anxiety, chronic sleep impairment, and difficulty in establishing and maintaining effective work and social relationships. 




The VA examiner noted that the Veteran did not appear to having symptoms that were new or noticeably worse and that the Veteran's feeling of sadness and hopelessness were likely related to family losses more than posttraumatic stress disorder. 

Reconciling the various reports into a consistent disability picture, two elements of the present disability emerge. First, the Veteran has symptomatology that is associated with the rating criteria and symptomatology not covered in the rating criteria, but is associated with the diagnosis of posttraumatic stress disorder under the DSM-IV, which is referred to in 38 C.F.R. Part 4, § 4 .130 (rating mental disorders). And two, the Veteran's overall severity of symptoms associated with posttraumatic stress disorder had remained constant without material change from the effective date of service connection. 

As for occupational impairment, there is no evidence that symptoms of posttraumatic stress disorder were a factor in the Veteran's occupational functioning. He had no conflicts or problems at work and worked for Bell Helicopters for 12 years. 

As for social impairment, the Veteran appeared to have a good relationship with his wife, brother and granddaughter as well as some friends. His relationships seemed to have improved since the last VA examination.

The Veteran did suffer from recurrent and distressing recollections, recurrent distressing dreams, feeling detached and estranged from others, had difficulty falling and staying asleep, was irritable or had outbursts of anger, and was hypervigilant.

And the VA examiner stated that the Veteran did not appear to have symptoms that were new or noticeably worsened. 




The Veteran was no longer in therapy or treated with medication for his posttraumatic stress disorder and the GAF score of 55 indicates moderate symptoms or moderate difficulty in occupational and social functioning.

The symptoms of posttraumatic stress disorder have resulted in a disability picture demonstrating occupational and social impairment with reduced reliability and productivity due to such symptoms as impairment of short term memory, impaired judgment, disturbances of motivation and mood, and difficulty in establishing and maintaining effective work relationships.

The Veteran does have symptoms attributable to posttraumatic stress under DSM-IV, such as recurrent and distressing recollections, recurrent distressing dreams, detachment and estrangement from others, sleep disturbance, irritable or outbursts of anger, and hypervigilance, but the symptoms do not more nearly approximate or equate to occupational and social impairment with deficiencies in most areas, such as work, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation, obsessional rituals which interfered with routine activities, illogical or irrelevant a speech, near-continuous panic attacks or depression affecting the ability to function independently, spatial disorientation, neglect of personal appearance and hygiene, difficulty in adapting to stressful circumstances, or the inability to establish and maintain effective relationships. 

From the effective date of service and currently, the preponderance of the evidence is against a rating higher than 50 percent at any time during the appeal period. 

Extraschedular Consideration

Although the Board is precluded by regulation from assigning an extraschedular rating under 38 C.F.R. § 3.321(b)(1) in the first instance, the Board is not precluded from considering whether the case should be referred to the Director of VA's Compensation and Pension Service for such a rating.



The threshold factor for extraschedular consideration is a finding that the evidence presents such an exceptional disability picture that the available schedular rating for the service-connected disability is inadequate. This is accomplished by comparing the level of severity and symptomatology of the service-connected disability with the established criteria.

If the criteria reasonably describe the disability level and symptomatology, then the disability picture is contemplated by the Rating Schedule, and the assigned schedular rating is, therefore, adequate and referral for an extraschedular rating is not required. Thun v. Peake, 22 Vet. App. 111, 115 (2008), aff'd sub nom. Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009).

Comparing the Veteran's current disability level and symptomatology to the Rating Schedule, the degree of disability is encompassed by the Rating Schedule and the assigned schedule rating is adequate and no referral to an extraschedular rating is required under 38 C.F.R. § 3.321(b)(1). 

In other words, the Board finds that the rating criteria reasonably describe the Veteran's disability and symptomatology, and the Veteran does not have any symptomatology not already encompassed by the Rating Schedule.

Total Disability Rating for Compensation based on Individual Unemployability 

The Veteran has not raised the claim for a total disabled rating for compensation based on individual unemployability and the claim is not reasonably raised by the record as the Veteran is working. See Rice v. Shinseki, 22 Vet. App. 447 (2009) (in a claim for increase, where the Veteran expressly raises a claim for a total disability rating on the basis of individual unemployability or the claim is reasonably raised by the record, the claim is not a separate claim, but a part of a claim for increase).





ORDER

An initial rating of 50 percent for posttraumatic stress disorder from the effecticve date of service connection is granted.

A rating higher than 50 percent for posttraumatic stress disorder at any time during the appeal period or currently is denied. 


REMAND

On the claim of service connection for a skin disorder, the Veteran served in Vietnam from August 1968 to September 1969 and it is presumed he was exposed to Agent Orange. 

After service, the Veteran was treated for facial acne in September 1971. The Veteran had continuous skin problems of the face, back and neck from 1971 to 1986 then again from 1989 to 1998. In August 2005, a private physician diagnosed chloracne. 

On VA examination in February 2010, the Veteran was diagnosed as having a history of acne vulgaris and mild oily skin. The VA examiner stated that there were no cutaneous findings consistent with chloracne. The VA examiner found no evidence to support the diagnosis of chloracne and no evidence of residuals of chloracne. 

As the evidence of record is insufficient to decide the claim under the applicable theories of service connection, further development under the duty to assist is needed. 



Accordingly, the case is REMANDED for the following action:

1. Ask the Veteran either to submit or to authorize VA to obtain on his behalf private medical records, pertaining to treatment of his skin condition. 

2. Afford the Veteran VA examination by a dermatologist to determine:

a). Does the Veteran have a skin disease? 

b). If so, whether it is more likely than not (probability greater than 50 percent), at least as likely as not (probability of 50 percent), or less likely than not (probability less than 50 percent), that the current skin disease is chloracne or other acneform disease consistent with chloracne? 

c). If so, whether it is more likely than not (probability greater than 50 percent), at least as likely as not (probability of 50 percent), or less likely than not (probability less than 50 percent), that the chloracne or acneform disease represents a progression of the skin disorder in 1971 or the development of a new and separate condition? 

d). If the current skin disease is not chloracne or acneform disease, whether it is more likely than not (probability greater than 50 percent), at least as likely as not (probability of 50 percent), or less likely than not (probability less than 50 percent), that the current skin disease is actually caused by exposure to Agent Orange? 



The Veteran is competent to describe skin problems, which is capable of lay observation since service. 

If, however, after a review of the record, an opinion is not possible without resort to speculation, the VA examiner is asked to clarify that the opinion cannot be rendered because there are other potential causes for the current skin disease, please identify the other potential causes, when the skin symptoms the Veteran has described within one year of service are not more likely than any other etiology related to the current skin disease and that an opinion is beyond what may be reasonably concluded based on the evidence of record and current medical knowledge. 

Photographs of the face, head, and neck must be included in the examination report.

The Veteran's file must be made available to the VA examiner.

3. On completion of the development, the claim should be adjudicated. If the benefit is denied, then furnish the Veteran and his representative a supplemental statement of the case and return the case to the Board. 

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).








The claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2012).



______________________________________________
George E. Guido Jr.
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs